# United States District Court

## EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| MCAFEE, LLC | § | |
| | § | |
| v. | § | Civil Action No. 4:19-CV-463 |
| | § | Judge Mazzant |
| JENNIFER E. KINNEY, et al. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff McAfee, LLC's Emergency Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. #2) ("Motion for Preliminary Injunction"). Having considered the motions, the relevant pleadings, and the evidence and arguments made at the four-day preliminary injunction hearing,[1] the Court finds that the Motion for Preliminary Injunction should be denied.

## BACKGROUND

Plaintiff McAfee, LLC filed suit against Defendants Jennifer E. Kinney ("Kinney"), Alan P. Coe ("Coe"), Percy O. Tejeda ("Tejeda") (collectively "Individual Defendants"), and Tanium, Inc. ("Tanium") (collectively "Defendants") after the Individual Defendants left their employment with Plaintiff to join Plaintiff's alleged competitor, Tanium. Each of the Individual Defendants signed an employment agreement, which contained a confidentiality provision and a non-solicitation provision. The Court uses Tejeda's agreement as an example, but all of the Individual Defendants have substantially similar, if not identical, provisions in their agreements.

### 3. Confidential Information and McAfee Property
During and after my McAfee employment, I will hold in strict confidence and not disclose or use any Confidential Information connected with McAfee business or the business of any McAfee's suppliers, customers, employees, or contractors unless (i) such disclosure or use is required in connection with my McAfee work, (ii) such information becomes lawfully and publicly known outside McAfee, or (iii)

---

[1] The Court held one full day of the hearing and three separate half days.

an McAfee officer expressly authorizes such disclosure or use in advance and in writing. For purposes of this Agreement, Confidential Information includes, without limitation: technical information (e.g. roadmaps, schematics, source code, specifications), business information (e.g. product information, marketing strategies, markets, sales, customers, customer lists or phone books), personnel information (e.g. organizational charts, employee lists, skill sets, employee health information, names, phone numbers, email addresses, personnel files, employee compensation except where the disclosure of such personnel information is permissible under local labor law such as the right of employees to discuss compensation and working conditions under the US National Labor Relations Act), and other non-public McAfee data and information of a similar nature. . . . I agree that any violation of this provision will result in immediate and irreparable injuries and harm to McAfee, and that McAfee shall be entitled to all available legal and equitable remedies, including injunctive relief and specific performance, without having to post bond.

. . .

**5. Non-Solicitation and Misappropriation of Trade Secrets**
McAfee's Confidential Information includes confidential and private information relating to other employees and customers. Additionally, McAfee has a legitimate business interest in its continuing employment and customer relationships and in protecting those relationships from unlawful interference. Accordingly, I agree that during my employment and for twelve (12) months after my employment ends, I will not solicit, directly or indirectly, any employee to leave his/her employment with McAfee. During the twelve (12) months after my employment ends, this applies to any employees that were employed with McAfee as of my separation date from the Company and with whom I had business contact or about whom I had access to Confidential Information during my previous two years of employment with the Company prior to my separation. I further agree that I shall not use or disclose McAfee Confidential Information to aid any third party to target, identify, and/or solicit McAfee customers or McAfee employees to leave McAfee employment and/or misappropriate McAfee trade secrets or assist or aid any third party in any manner to do the same. I agree that any violation of this provision will result in immediate and irreparable injuries and harm to McAfee, and that McAfee shall be entitled to all available legal or equitable remedies, including injunctive relief and specific performance, without having to post bond. I understand that nothing in this Agreement prohibits me from disclosing my compensation information to third parties in accordance with applicable law.

(Dkt. #1, Exhibit 1 at pp. 20–21).

Tejeda was the first employee to leave work with Plaintiff in October 2018 to take a similar job with Tanium. After his departure, Tejeda reached out to both Coe and Kinney to discuss

opportunities for them at Tanium. Both Kinney and Coe eventually left their jobs with Plaintiff and accepted employment with Tanium in March and May of 2019 in positions similar to their jobs with Plaintiff. The Individual Defendants all informed Plaintiff that they were leaving for work at Tanium. The forensic analysis of Kinney and Coe's McAfee issued computers suggest that they accessed Plaintiff's confidential documents or documents that contained Plaintiff's confidential information on their last day.

Based on these general facts, on June 24, 2019, Plaintiff filed suit against Defendants asserting claims for misappropriation of trade secrets, breach of contract, tortious interference with contract, breach of fiduciary duties, aiding and abetting breach of fiduciary duties, and conspiracy (Dkt. #1). On June 24, 2019, Plaintiff simultaneously asked the Court to enter a temporary restraining order ("TRO") and a preliminary injunction (Dkt. #2). The Court set the TRO request for a hearing to occur on June 25, 2019 (Dkt. #8). On June 25, 2019, the parties submitted an agreed TRO for the Court to enter (Dkt. #14) and the Court set a preliminary injunction hearing to occur on July 9, 2019. Subsequently, the parties jointly sought to modify the TRO and to reset the preliminary injunction hearing for July 30, 2019 (Dkt. #19), which the Court granted (Dkt. #20).

On July 29, 2019, Tanium filed a trial brief (Dkt. #44) that appeared to be a response to the motion for preliminary injunction. The Court held the first day of its preliminary injunction hearing on July 30, 2019. At the hearing, the Court discussed the trial brief with Tanium and informed Tanium, this was not the proper way to file a response to the motion. The Court held the second day of the preliminary injunction hearing on July 31, 2019. At the second day, the parties informed the Court that it had made a mistake in the language of its motion to modify the TRO. As a result, the TRO expired on July 30, 2019. Defendants also informed the Court that Kinney had been terminated from her employment with Tanium and requested that the Court modify the

TRO as to Kinney. On July 31, 2019, the Court extended the TRO at the request of the parties and modified the TRO as to Kinney (Dkt. #49). On August 1, 2019, Plainitff filed a motion to modify the TRO regarding Coe, in order to allow Coe to return to work for Tanium (Dkt. #56). On August 12, 2019, Tanium filed a motion for leave to file a response to the motion for preliminary injunction (Dkt. #66), filed its response (Dkt. #67), and the Individual Defendants filed a motion for leave to join in that response (Dkt. #68). On August 13, 2019, the Court held the third day of the preliminary injunction hearing. On August 14, 2019, the Court held the fourth and final day of the preliminary injunction hearing. Additionally, on August 14, 2019, the Court extended the TRO for an additional fourteen days, as agreed by the parties (Dkt. #75) and modified the TRO to allow Coe to return to work (Dkt. #74). On August 15, 2019, the Court held a telephone conference to discuss the briefing schedule following the hearing and at that time the Court orally granted Tanium and the Individual Defendants' request for leave to file and join in the response to the motion for preliminary injunction. On August 21, 2019, Plaintiff filed a reply to its motion for preliminary injunction (Dkt. #91).

Following the hearing and as requested by the Court, Plaintiff filed its closing arguments in writing on August 16, 2019 (Dkt. #80). On August 20, 2019, Tanium and the Individual Defendants filed their responses to Plaintiff's closing arguments (Dkt. #85; Dkt. #86). On August 21, 2019, Plaintiff filed its reply to the closing arguments (Dkt. #91).

Additionally, on August 15, 2019, Plaintiff filed an amended notice of filing original discovery to be used as evidence in connection with Plaintiff's emergency motion for TRO and preliminary injunction (Dkt. #76). On August 16, 2019, Plaintiff filed a notice of filing declarations, regarding Plaintiff's Exhibit 161 (Dkt. #78). The Individual Defendants objected to both submissions (Dkt. #79). Further, on August 19, 2019, Plaintiff filed its Brief Regarding

Admissibility of Summary Evidence of Voluminous Documents Under Federal Rule of Evidence 1006, regarding Plaintiff's Exhibit 161 (Dkt. #81). On August 21, 2019, Defendants filed a response to this brief (Dkt. #90).

## LEGAL STANDARD

A party seeking a preliminary injunction must establish the following elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiffs will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Id.* Nevertheless, a movant "is not required to prove its case in full at a preliminary injunction hearing." *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1985) (quoting *Univ. of Tex. v. Comenisch*, 451 U.S. 390, 395 (1981)). The decision whether to grant a preliminary injunction lies within the sound discretion of the district court. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

## ANALYSIS

Plaintiff requested the Court enter a preliminary injunction after the Court entered the parties' agreed TRO. The Court held a hearing regarding the preliminary injunction request. In this order, the Court will address the merits of the motion for the preliminary injunction and any objections raised in the briefing or in the hearing that the Court took under advisement.

## I.      Merits of the Request for Preliminary Injunction

Plaintiff asks the Court to enjoin the Defendants in this case based on its causes of action for breach of contract, tortious interreference with contract, and misappropriation of trade secrets.

Plaintiff contends that it has sufficiently shown all four elements for each cause of action asserted as a basis to enjoin each Defendant in this case. Defendants disagree. Because there are four different defendants in this case, the Court will address Defendants collectively where possible, but separately when necessary.

## A. Tejeda, Coe, and Tanium

Plaintiff asserts that it has sufficiently demonstrated the preliminary injunction elements. Tejeda, Coe, and Tanium disagree. The Court will turn to the first element: whether Plaintiff has demonstrated a likelihood of successes on the merits.

Plaintiff filed suit against Tejeda, Coe, and Tanium alleging misappropriation of trade secrets under both 18 U.S.C. § 1836 and the Texas Uniform Trade Secrets Act, and conspiracy to misappropriate trade secrets, tortiously interfere with contracts, and breach of fiduciary duties (Dkt. #1). Plaintiff adds a cause of action for breach of contract against Tejeda and Coe (Dkt. #1). Plaintiff additionally alleges a cause action for tortious interference with contract and aiding and abetting breach of fiduciary duty against Tejeda and Tanium (Dkt. #1). Finally, Plaintiff claims Coe breached his fiduciary duties (Dkt. #1). Plaintiff seeks an injunction using: (1) its misappropriation of trade secrets, tortious interference, and breach of contract causes of action as the basis to enjoin Tejeda; (2) its misappropriation of trade secrets and breach of contract causes of action against Coe; and (3) its misappropriation of trade secrets and tortious interference causes of action to enjoin Tanium. Before delving into an analysis on whether Plaintiff has shown a substantial likelihood of success on the merits on all these claims, the Court must address some preliminary matters.

Regarding the claims asserts against Tejeda, in an order entered on this same day, the Court dismissed Plaintiff's claim for breach of contract against Tejeda, finding it lacked personal

jurisdiction over that claim. Thus, the Court only looks to misappropriation and tortious interference in determining whether Plaintiff is entitled to a preliminary injunction against Tejeda.

The Individual Defendants ask the Court to limit that further to only considering misappropriation, arguing that Plaintiff did not initially request to enjoin Tejeda based on tortious interference and that it was a trial by surprise. In its initial motion with the Court, Plaintiff asks the Court to enjoin Defendants, using breach of contract and misappropriation as the basis for the injunction (Dkt. #2). In its closing arguments, Plaintiff uses tortious interference as an additional basis for an injunction in this case, claiming in a footnote that it has "discovered evidence to support a preliminary injunction against further tortious interference by Tanium and Tejeda, and the parties presented such evidence without objection during the preliminary injunction hearing. Accordingly, the issue has been fully litigated by consent for purposes of the injunction." (Dkt. #80 at p. 12 n.5). The Individual Defendants dispute this contention and counter that the evidence presented at the preliminary injunction hearing that applies to the tortious interference claim also applies to other claims, and thus, there was no clear indication that Plaintiff was raising tortious interference.

The Court disagrees with the Individual Defendants. Plaintiff made clear in the preliminary injunction hearing that it was seeking an injunction based, not only on breach of contract and its trade secret claims, but also pursuing an injunction on tortious interference. In Plaintiff's counsel's opening statement, he stated that "the evidence is going to show a *prima facie* case for breach of contract, tortious interference, and trade secret claims." (Dkt. #62 at 29:8–10). The Court finds this claim in opening statements to be clear notice that Plaintiff was pursuing an injunction based on its tortious interference claims. *See Humana Ins. Co. v. Tenet Health Sys.*, No. 3:16-cv-2919, 2016 WL 6893629, at *35 (N.D. Tex. Nov. 21, 2016). As such, the Court addresses the likelihood

of success as to Plaintiff's claims for misappropriation of trade secrets, tortious interference with contract, and breach of contract.

### 1. Misappropriation of Trade Secrets against Tejeda, Coe, and Tanium

Plaintiff claims that it has shown a *prima facie* case that Tejeda, Coe, and Tanium have misappropriated Plaintiff's trade secrets. Tejeda, Coe, and Tanium disagree.

A claim for misappropriation of trade secrets requires: (1) a trade secret; (2) misappropriation; and (3) use in interstate commerce. 18 U.S.C. § 1836(b)(1). A trade secret[2] includes all business information, including compilations, if the owner has taken reasonable measures to keep such information secret, that derives independent economic value from not being generally known to and not being readily ascertainable by another person who can obtain economic value from the disclosure or use of the information. *Id.* § 1839(3). Plaintiff contends that it has demonstrated a *prima facie* case that a trade secret exists here. Plaintiff asserts that its trade secrets encompass "McAfee's particular business processes, best practices, and institutional knowledge for approaching sales, marketing, pricing, and customer relationship", which Plaintiff further explains "is not in a pricing matrix or off-the-shelf software like Anaplan, but is present in the gatekeeping, shepherding, and advocacy functions that McAfee deal desk employees undertake when serving as trusted advisors to the McAfee sales teams." (Dkt. #80 at p. 14).

---

[2] Texas has adopted the Texas Uniform Trade Secrets Act ("TUTSA"), which has similar elements to the federal act. Under the TUTSA, a trade secret is defined as:

> information, including a formula, pattern, compilation, program, device, method, technique, process, financial data, or list of actual or potential customers or suppliers, that: (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

TEX. CIV. PRAC. & REM. CODE § 134A.002(6).

Instead of focusing on whether Plaintiff can prove the existence of trade secret, for the purposes of this preliminary injunction request, Tejeda, Coe, and Tanium instead challenge that Plaintiff has not sufficiently shown that they have misappropriated any trade secret or used any trade secret. The Court will only address the specific challenges in this case.

Under DTSA, "misappropriation" means

(A) acquisition of a trade secret by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who—

    (i) used improper means to acquire knowledge of the trade secret;

    (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

        (I) derived from or through a person who had used improper means to acquire the trade secret;

        (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

        (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

    (iii) before a material change of position of the person, knew or had reason to know that—

        (I) the trade secret was a trade secret; and

        (II) knowledge of the trade secret had been acquired by accident or mistake

18 U.S.C. § 1839(5). "Improper means" "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).[3]

In its closing arguments, Plaintiff argues that Tejeda and Coe both misappropriated trade secrets relating to Plaintiff's best business practices and that Tanium was interested in those trade secrets and put Tejeda and Coe in a position such that disclosure of Plaintiff's trade secrets were

---

[3]Misappropriation and improper means have the same definitions under the federal and Texas acts. *Compare* 18 U.S.C. § 1839(5) *with* TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(3).

probable without placing any restrictions on Tejeda and Coe. Moreover, Plaintiff contends that Coe took Plaintiff's confidential documents before leaving to work for Tanium. Tejeda, Coe, and Tanium contest that these allegations demonstrate misappropriation in this instance. The Court first looks to the allegation that Coe took confidential documents and then turns to the probable or inevitable disclosure.

### a. Documents

According to a digital forensic report conducted by Plaintiff, Coe used his computer issued by Plaintiff to access several confidential documents between 1:36 p.m. and 5:43 p.m. on May 13, 2019, which was his last day with Plaintiff (PX 97 at pp. 5–6). Coe also connected a USB thumb-drive to his computer and a printer to the computer (PX 97 at p. 5). Based on these findings, Plaintiff maintains that Coe improperly took Plaintiff's confidential documents with him after he ended his employment with Plaintiff.

Coe presented evidence at the hearing, that on the day he resigned, he was working from home and he called Brent Sturman, his supervisor, to resign, and let him know he would be happy to work for two more weeks but informed him he was leaving to work for Tanium and so left the decision up to Plaintiff on what they wanted to do (Dkt. #92 at 26:18–20, 27:3–7). At some time later that afternoon, after speaking with human resources, Sturman called Coe and informed him that he had ten minutes of system access and then he would be shut off (Dkt. #92 at 27:18–23). Coe responded that he wanted to gather information on the most recent things he was working on, to assist in the transition (Dkt. #92 at 27:25–28:3, 28:8–11). Ultimately, Coe sent two emails containing the most recent projects he was working on to both Sturman and Lori Johnson (Individual Defendants' Exhibit 62; Individual Defendants' Exhibit 63). These emails were sent at 5:35 p.m. and 5:43 p.m., directly corresponding to the time frame Coe was accessing documents

on his computer according to the forensic analysis Plaintiff conducted. *Compare* (Individual Defendants' Exhibit 62; Individual Defendants' Exhibit 63) *with* (PX 97 at pp. 5–6). Coe additionally testified that the documents that are identified in Plaintiff's forensic analysis are essentially the files that are attached to the emails, explaining that it is possible he opened some and determined they were not relevant to attach (Dkt. #92 at 34:19–35:12). Further, Coe testified that he reviewed the digital discovery report Defendants conducted after this suit was initiated. According to Coe's testimony based on his review of the report, none of the confidential documents he accessed on his last day were on his USB thumb-drive (Dkt. #92 at 46:10–12) (explaining that the only thing found on the USB thumb-drive were five scans that the Court will address below). [4]

As to the USB thumb-drive, Coe explained that he had a client, while working for Plaintiff, that required a "wet signature", which meant he would have to print the deal, sign it, scan it on to his USB thumb-drive, and then insert the USB thumb-drive into his computer to send to the client (Dkt. #92 at 36:3–10). Coe testified that he plugged the USB thumb-drive in on his last day to remove all of Plaintiff's data, as this was also his personal USB thumb-drive (Dkt. #92 at 36:18–19). Coe additionally testified, that his review of Defendants' digital discovery showed any scans that were opened on May 13, 2019 were deleted, thereby confirming that Coe was attempting to delete Plaintiff's information from his personal USB thumb-drive (Dkt. #92 at 36:22–37:2). Coe further testified that his USB thumb-drive was read only and, as such, he could not download anything onto the USB thumb-drive (Dkt. #92 at 37:18–25). There were still five remaining scans from the client that required the "wet ink" signature; however, Coe testified that they were scans

---

[4] The Court notes that this is Coe's testimony on what he observed from reviewing the digital discovery and is not the actual digital discovery report. This alone does not suggest Coe did not take documents but is further evidence to support the claim.

located among numerous personal scans that he missed deleting in the ten minutes he had to wrap up his employment with Plaintiff and that he had no idea they were even there and never accessed them after his employment with Plaintiff ended (Dkt. #92 at 46:10–16).

Finally, regarding the printer that was connected to Coe's computer on the last day, Coe testified that it did not have any storage functions (Dkt. #92 at 37:10–11). There is no evidence that he printed any information and Coe additionally testified that after the lawsuit was filed, he checked to make sure he did not have any hard copies of any documents and found that he did not have anything (Dkt. #92 at 44:19–45:4).

Plaintiff offered no evidence, either direct or circumstantial, that Coe retained or used any of the documents he accessed on his last day other than to attach them to his separation emails. Moreover, if the five scans that Coe did not delete from his USB thumb-drive are confidential documents, Plaintiff has offered no evidence, direct or circumstantial, that Coe ever accessed, used, or was in the position to use these specific scans. Based on the facts presented, the Court does not find that Plaintiff demonstrated a *prima facie* case showing Coe misappropriated any confidential documents from Plaintiff.

### b. Probable or Inevitable Disclosure

Plaintiff relies on the argument that disclosure is probable based on the facts of the case. Plaintiff maintains that Tanium and Plaintiff are direct competitors, Tejeda's and Coe's roles at Tanium is substantially similar to their former roles with Plaintiff, and thus, that the disclosure of their knowledge of Plaintiff's trade secrets is probable. The Individual Defendants argue that the

"inevitable disclosure" doctrine is not a viable doctrine to rely on,[5] and that even if it was, Plaintiff cannot meet it in this case.

Plaintiff's argument is belied by its own actions.[6] Plaintiff also hires people for deal desk positions, from competing companies, without putting any form of safeguards in place to ensure these new employees do not use any confidential information of the prior company. In fact, Plaintiff hired Coe, who had performed similar job duties for at least four technology companies prior to working for Plaintiff (Dkt. #63 at 152:11–153:8). Plaintiff did not place any restrictions on Coe in his role with Plaintiff, which is the same thing Plaintiff now criticizes Tanium for not doing in this case.[7]

Second, Plaintiff waited about eight months after Tejeda left and over a month after Coe left to seek an injunction against them. If being in similar role is as detrimental as Plaintiff claims, Plaintiff would have sought to place restrictions on Tejeda and Coe as soon as they left. Plaintiff cannot point to anything that would provide a justification for waiting to impose restrictions, Plaintiff knew where Tejeda and Coe were going when they left their employment with Plaintiff.

---

[5] The Individual Defendants, as to Tejeda, argue that California law should apply as opposed to Texas law; however, according to the Individual Defendants the "inevitable disclosure" doctrine is not viable in Texas or California. The Court finds it unnecessary to decide this issue at this time.

[6] The Court also finds that Plaintiff has not sufficiently demonstrated that disclosure would be inevitable or probable based on the nature of deal desk employment at both Plaintiff and Tanium. Deal desk employees work in the finance department and the sales team will present deal desk employees with deals they have arranged with clients to get approval from the finance department. There are several variables that go into whether a deal desk employee will approve a deal offered by a sales person that are factually specific to each sale and each client at the time the deal is presented. *See, e.g.*, (Dkt. #92 at 169:27–171:10). Because of the specific factual nature of each deal, it is not necessary that Tejeda, Coe, or any deal desk employee, would disclose its former employer's trade secrets in approving these deals. This is only further supported by the fact that Tanium was already in the industry prior to Tejeda and Coe joining Tanium, already had developed the system of how to seek approval on deals, and already had established its own pricing module. *See, e.g.*, (Dkt. #63 at 165:9–15, 168:15–23; Dkt. #92 at 8:23–9:12). Accordingly, the Court does not find disclosure would be necessary, inevitable, or probable in this situation.

[7] There are also several former employees of McAfee who left to work at competitors and Plaintiff did not take action to ensure they are not using trade secrets in similar jobs. The Court however acknowledges Plaintiff's ability to pursue action in some cases and not others.

Moreover, there has not been a change in circumstance regarding Tejeda as there is not even a suggestion that Plaintiff later discovered he took documents.

Finally, if the simple fact that Tejeda or Coe are working in a similar job creates the probable chance for disclosure of trade secrets, Plaintiff could have put a non-competition provision in their employment agreements, along with the non-solicitation and non-disclosure provisions. However, Plaintiff chose not to do so. The Court will not assist Plaintiff in creating one through an injunction after the employment relationship has ended.

Despite its own actions, Plaintiff argues this case is factually like *SPBS*, where the Court noted that "proof of the defendant's knowledge of the trade secret together with substantial similarities between the parties' products or processes may justify an inference of use by the defendant." *SPBS, Inc. v. Mobley*, No. 4:18-cv-391, 2018 WL 4185522, at *7 (E.D. Tex. Aug. 31, 2018) (quotations omitted). However, the facts presented in *SPBS* could not be more different than the facts currently in front of the Court. In *SPBS*, the individual defendant had a non-compete agreement with the plaintiff. Moreover, the facts and evidence demonstrated that the individual defendant left his employment with SPBS misleading his supervisors by claiming that he was going to a company in a completely different industry, but instead went to a direct competitor; he permanently deleted company emails and flash drives; after he left, a customer the defendant had been working with while employed at SPBS terminated its contract with SPBS "effective immediately", and the defendant again claimed he was not working for a competitor when asked about the client who left. *Id.* at *6–7. Based on these facts, the Court found that the defendant "had access to SPBS's Proprietary Information and likely took the Propriety information to [the competitor]." *Id.* at *7.

In this case, Tejeda and Coe both informed Plaintiff that they were leaving to work for Tanium. There is not even a suggestion that Tejeda took any documents or deleted any emails to hide wrongdoing from Plaintiff, and the Court has previously determined that Coe's actions on his last day do not amount to misappropriation of any confidential information.[8] Moreover, Plaintiff offered no evidence that Plaintiff was actively losing customers that Tejeda or Coe were working with before they left. There is further no evidence that Tanium received any trade secrets from Tejeda or Coe.[9]

Moreover, while the Court did state that "proof of the defendant's knowledge of the trade secret together with substantial similarities between the parties' products or processes may justify an inference of use by the defendant," this statement was not determinative in *SPBS*. *Id.* As an initial matter, the Court stated that similarities *may* justify an inference, but it does not necessitate one. *Id.* Further, the Court found that SPBS presented a plethora of circumstantial evidence that, while working in a substantially similar job, the individual defendant actually used SPBS's trade secrets, by visiting and contacting several clients he worked with while at SPBS immediately after he left and joined a competitor. *Id.* at *7–8. There is no such evidence in this case. As such, while the Court *may* find job similarity to raise an inference of use, it does not have to, and the facts of this case do not warrant making that inference. Thus, the Court finds that Plaintiff has not shown a substantial likelihood of success on the merits.

---

[8] The Court notes that Plaintiff argues that there is evidence the Individual Defendants took confidential information and states that "some of those documents were of little concern" but it focuses on the confidential nature of the Deal Desk Tracker, which is a document that Kinney retained from her work with Plaintiff, not Coe or Tejeda. (Dkt. #89 at p. 9).

[9] Plaintiff also argues that Tejeda and Coe's job with Plaintiff was the only experience they had in the cybersecurity industry, thus, all knowledge they have should be inferred to have come from Plaintiff. However, the evidence suggests the opposite for Coe. While he may have not worked in cybersecurity, he had performed essentially the same role at several companies before working for Plaintiff, and testified that he had been operating in the same manner since his first job in this space. (Dkt. #63 at 152:11–153:8; Dkt. #92 13:16–25).

### 2. Breach of Contract Against Coe

Plaintiff claims that it has shown a *prima facie* case that Coe breached his contract with Plainitff. Coe disagrees.

Under Texas law, "[t]he elements of a breach of contract claim are: (1) the existence of a valid contract between plaintiff and defendant; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of the contract; and (4) the plaintiff's damage as a result of the breach." *In re Staley,* 320 S.W.3d 490, 499 (Tex. App.—Dallas 2010, no pet.).

Plainitff argues that it has made a *prima facie* showing that Coe has breached his contractual obligations with Plaintiff. According to Plaintiff, Coe signed an Employment Agreement in 2017 ("Coe's Employment Agreement") and a Proprietary Information and Inventions Assignment Agreement in 2018 (the "PIIAA"). According to these agreements, Plaintiff contends that Coe was required to keep all Plaintiff's non-public information confidential. Plaintiff asserts that Coe disclosed Plaintiff's confidential information, by discussing personnel information with Tejeda during recruitment, Coe's plan to work on SLED[10] accounts with Tanium, Coe's assignment to government accounts with Tanium, and Coe's work with clients that he worked with while at McAfee all demonstrate breaches or breaches that are likely to occur in the future.

The Individual Defendants respond that the PIIAA is the active agreement between Coe and Plaintiff, and that Plaintiff put forward no evidence that Coe violated the PIIAA. According to the Individual Defendants, Coe complied with all terms of the PIIAA. Moreover, the Individual Defendants maintain that there is nothing inappropriate about Coe working on SLED accounts for

---

[10] As defined by McAfee, SLED means state and local government and educational establishments in the United States. (Dkt. #92 at 164:20–25).

Tanium, as he did not work on SLED accounts for McAfee. Finally, according to the Individual Defendants any of the personnel information disclosed was publicly known.

As an initial matter the Court finds that Coe's Employment Agreement and the PIIAA are substantively similar when it comes to the requirement to not disclose any confidential information. Thus, at this stage, the Court need not decide the governing agreement. Coe's Employment Agreement, as it related to the non-disclosure provision states: "[d]uring and after my McAfee employment, I will hold in strict confidence and not disclose or use any Confidential Information connected with McAfee business or the business of any McAfee's suppliers, customers, employees, or contractors unless . . . such information becomes lawfully and publicly known outside McAfee" (PX 67 at p. 1). Confidential information is described as "technical information", "business information", "personnel information", and other non-public McAfee data and information of a similar nature." (PX 67 at p. 1).

Plaintiff first alleges that the disclosure of personnel information to Tejeda during his recruitment process violates his confidentiality obligations under his agreement. In February 2019, having heard of layoffs at McAfee, Tejeda reached out to Coe to see how Coe was doing and to see if things had been calming down at McAfee (Individual Defendants' Exhibit 21 at Tejeda_1318). Coe responded:

> I don't know that it's settled down that much. They got rid of McAllister at the end of January and Jason Anderson just left to go to Forescout. So I think the ripples from that haven't been felt yet – whether they replace him externally or with Ken or Pat. Brent decided to hire someone to lead NA deal desk but he hasn't said who and they haven't announced it so I have to believe it's external. So it's calmer that I don't see another round of cuts immediately but I think there are still ripples we are going to see and who knows what that means for stability the rest of the year.

(PX 33 at p. 1). Tejeda sent a reply stating "Yikes! Heard about Bill and Jason. But the hire of an external DD lead for Americas sounds ugly." (PX 33 at p. 2).

This is the type of information that would typically qualify as personnel information under Coe's Employment Agreement. (PX 67) (explaining that personnel information includes "organizational charts, employee lists, skill sets, employee health information, names, phone numbers, email addresses personnel files, employment compensation . . .").[11] However, based on the facts before the Court, this information was all publicly known information or not even information of Plaintiff. First, the Individual Defendants presented evidence that McAfee layoffs were publicly known with an article titled "McAfee Lays Off Hundreds, Senior Executives Depart" (Individual Defendants' Exhibit 60). This article specifically references that Bill McAllister—the McAllister that Coe discussed with Tejeda—left McAfee (Individual Defendants' Exhibit 60 at p. 1). As to Jason Anderson, Coe testified that he did not find out about Anderson leaving through his employment with Plaintiff, but instead somebody at Forescout reached out to Coe to let him know that Anderson "was going over there." (Dkt. #92 at 20:2–7). Moreover, Tejeda already knew about Anderson leaving Plaintiff to join Forescout, Coe was not sharing any information that Tejeda did not already know on his own (PX 33 at p. 2). Finally, regarding the new hire for the North America deal desk lead, Coe testified that he did not actually have any knowledge on this, but it was an assumption he made. Coe testified that he applied for the position and had been told that he did not get the position (Dkt. #92 at 20:21–25). Coe assumed that if he had not been hired, that Plaintiff must be hiring an external person for the job because he was the most qualified for the position internally (Dkt. #92 at 20:25–21:3, 21:22–24). It turned out that his assumption was wrong, and Plaintiff did hire someone internally to take over the position

---

[11] The Court finds this likely would not classify as proprietary information under the PIIAA. (PX 68) (detailing that proprietary information of the company includes "employee personnel files and information about employee compensation and benefits"). This information does not discuss personnel files or compensation or benefits. However, because the Court does not find it to be personnel information under the employment agreement the distinction does not matter at this stage.

(Dkt. #92 at 22:1–7). As such, this does not indicate that Coe shared any personnel information with Tejeda, because it was his own assumption rather than the actual personnel decisions that were made by Plaintiff.

Next, Plaintiff argues that Coe breached his confidentiality obligations by his plans to "raid" SLED clients with Alan Buckley ("Buckley"), another former McAfee employee. As support for this contention, Plaintiff cites an email between Coe and Buckley, in which Coe tells Buckley to "[l]et [him] know when [Buckley has] some time to touch base on the SLED discussion." (PX. 87). Regardless of if this can demonstrate a "raid", it does not show the likely breach of any confidentiality obligations. While employed with Plaintiff, Coe was not assigned to work on SLED accounts. (Dkt. #92 at 165:7–16). Plaintiff has offered no other evidence to suggest that Coe obtained confidential information from Plaintiff regarding SLED accounts. Therefore, the Court does not find this sufficient to show a likely breach of Coe's confidentiality obligations.

Finally, the allegation that Coe is likely to disclose confidential information learned with Plaintiff based on being placed in a similar role has been previously addressed in the misappropriation section and that analysis similarly applies here. The Court finds that Plaintiff has not shown a substantial likelihood of success on its breach of contract claim against Coe.

### 3. Tortious Interference against Tejeda and Tanium

Plaintiff claims that it has shown a *prima facie* case that Tejeda and Tanium have tortiously interfered with Coe and Kinney's employment agreements. Tejeda and Tanium disagree.

To assert a tortious interference claim, a plaintiff must prove that (1) a contract subject to interference exists; (2) the act of interference was willful and intentional; (3) such intentional act

was a proximate cause of the plaintiff's damage; and (4) actual damage or loss occurred. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

Regarding Tejeda, Plaintiff maintains that as Coe and Kinney's former supervisor, Tejeda either knew or should have known about their employment agreements, which contained confidentiality provisions, and despite this knowledge he sought and obtained inside information about Plaintiff's operations and personnel. Plaintiff argues that it lost "two, long-time, high performing employees (Kinney and Coe) as a proximate result" of the alleged wrongdoing here. However, the Court notes that the tortious interference claim against Tejeda is based on his attempts to get Kinney and Coe to disclose confidential personnel information and was not based on his alleged improper solicitation claims—the basis of his breach of contract claim, which the Court has dismissed for lack of personal jurisdiction. The alleged information that Tejeda was able to get Kinney and Coe to disclose had to do with certain individuals who were laid off or left Plaintiff for other opportunities. Plaintiff has not shown how this was the proximate cause of any alleged damage. Thus, Plaintiff has not demonstrated a substantial likelihood of success on the merits as to its tortious interference claim with respect to Tejeda.

Regarding Tanium, Plaintiff contends that Tanium is liable for Tejeda's tortious conduct. However, based on the Court's finding that Plaintiff has not shown a substantial likelihood of success on the merits on its tortious interference claim against Tejeda, this argument falls flat.

Moreover, Plaintiff contends that Caren Carnecchia, Tejeda's supervisor at Tanium and former employee of Plainitff, should have known that Tejeda had a non-solicitation provision in his contract with Plaintiff, and that despite this knowledge she encouraged Tejeda to solicit Plaintiff's employees. The evidence is to the contrary. The evidence suggests that when Tanium hired Tejeda, Tanium asked if he had a non-solicitation provision, and he indicated that he did not.

(Tanium's Exhibit 11).[12]  "To establish a willful and intentional act of interference," . . . "[t]he interfering party must 'have actual knowledge of the contract or business relation in question, or knowledge of facts and circumstances that would lead a reasonable person to believe in the existence of the contract or business relationship.'" *Loco Brands, LLC v. Butler Am., LLC*, 6:18-cv-69-JDK-KNM, 2019 WL 2281252, at *2 (E.D. Tex. May 29, 2019) (quoting *Wolf v. Cowgirl Tuff Co*., 1:15-cv-1195, 2016 WL 4597638, at *4 (W.D. Tex. Sept. 2, 2019)).  The evidence here shows Tanium did not have knowledge, and therefore, it is not likely that Plaintiff will prevail on this basis for a tortious interference claim.

Finally, Plaintiff contends that Tanium tortiously interfered with Tejeda, Coe, and Kinney's employment agreements by putting them in similar positions without putting any safeguards in place.  However, just like the Court was not convinced by this argument when addressing Plaintiff's trade secret claims, the Court is not convinced here.  As such, Plaintiff has not demonstrated a substantial likelihood of success on the merits as to its tortious interference claim with respect to Tanium.  "[B]ecause the Court finds [Plaintiff] failed [to] satisfy the first element required to issue a preliminary injunction—a substantial likelihood of success on the merits—for either its breach of contract claim(s)[, tortious interference claims,] or misappropriation of trade secrets claim, it is unnecessary to address the remaining preliminary injunction elements." *Thoroughbred Ventures, LLC v. Disman*, 4:18-cv-318, 2018 WL 3752852, at *6 (E.D. Tex. Aug. 8, 2018).

## B.  Kinney

Plainitff sued Kinney alleging causes of action for misappropriation of trade secrets, breach of contract, breach of fiduciary duty, and conspiracy to engage in that activity.  Simultaneously,

---

[12] The Court does not rule on whether the non-solicitation provision is valid or whether California law or Texas law governs the contract.

Plaintiff asked the Court to enjoin Kinney, using misappropriation of trade secrets and breach of contract as the basis for this request. At the time, Kinney worked at Tanium in a position like the one she was in when she worked for Plaintiff. By the time of the preliminary injunction hearing, Tanium had terminated Kinney and Kinney is now unemployed.

One of the elements that Plaintiff must prove in order to obtain a preliminary injunction, is that the plaintiff is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). "To demonstrate threat of an irreparable injury, a plaintiff seeking injunctive relief must show 'a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *McKissock, LLC v. Martin*, 267 F. Supp. 3d 841, 858 (W.D. Tex. 2016). (quoting *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986)). Here, any breach Kinney may have committed in the past does not demonstrate a significant threat of an impending action, and can instead be remedied, if necessary, by monetary damages. Thus, because the Court finds there is not a threat of irreparable harm as to Kinney, the Court need not discuss the remaining preliminary injunction elements. *See Thoroughbred Ventures*, 2018 WL 3752852, at *6.

## II. Objections

There are several evidentiary issues the Court must address relating to the preliminary injunction hearing and briefing.

First, during the hearing, Plaintiff called Kenneth Kartsen, a witness who was not on Plaintiff's original witness list. Plaintiff called him as a rebuttal witness to provide testimony on his personal knowledge, experience, education, training, and industry standard in rebuttal of testimony provided by Coe and others regarding the alleged competition between Tanium and Plaintiff. Defendants objected that he was disclosed late and that he should not be allowed to

testify. The Court allowed him to testify but took the ruling under advisement and would not consider his testimony if it found the disclosure to be improper. The Court, even considering Kartsen's testimony, finds Plainitff has not met its burden. Thus, the Court finds no prejudice in allowing Kartsen's testimony regardless of whether Plaintiff improperly disclosed Kartsen late or not. Accordingly, the objection is overruled.

Moreover, regarding Defendants' objections to the additional admissions and interrogatory responses provided in Plaintiff's Amended Notice of Filing Original Discovery (Dkt. #76), even considering the additional discovery, the Court finds an injunction is not warranted in the case. Thus, there is no prejudice in considering the discovery and the Court overrules Defendants objection.

Next, in its closing arguments, Plaintiff objected to the slides submitted by Tanium maintaining that they repeatedly referred to a forensic analysis conducted by a witness they chose not to call and a report they chose not to enter into evidence. Accordingly, Plaintiff objects to including that information in closing as it is not in evidence. The Court did not consider Tanium's slides in making its decision on this matter. Thus, the Court will sustain the objection.[13]

Finally, regarding Plaintiff's Exhibit 161, because the Court does not find the basis to enjoin Defendants, the Court finds it unnecessary to determine the admissibility of this exhibit, as it was presented to narrow the list of customers Defendants could not interact with while working for Tanium.[14]

---

[13] The Court does however note that there was evidence regarding the forensic analysis conducted by Defendants and the Court does discuss that forensic analysis in its analysis regarding claims against Coe. However, the Court does identify in that section that the report was not admitted, and this was a statement made by Coe based on his review of the analysis, which came in without objection.

[14] If Plaintiff also wished to use this as further explanation for how the Individual Defendants' jobs were similar at Tanium, the Court remains unpersuaded simply by suggesting overlapping customers. Thus, the Court finds it unnecessary to rule on the admissibility for that purpose as well.

**CONCLUSION**

It is therefore **ORDERED** that Plaintiff McAfee, LLC's Emergency Motion for Temporary

Restraining Order and Preliminary Injunction (Dkt. #2) is hereby **DENIED**.

**SIGNED this 29th day of August, 2019.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE